# Illinois Official Reports

## Appellate Court

---

### *Commonwealth Edison Co. v. Illinois Commerce Comm'n,*
### 2019 IL App (2d) 180504

---

| | |
|---|---|
| Appellate Court Caption | COMMONWEALTH EDISON COMPANY, Petitioner, v. THE ILLINOIS COMMERCE COMMISION; AMEREN ILLINOIS COMPANY, d/b/a Ameren Illinois; ASSOCIATION OF ILLINOIS ELECTRIC COOPERATIVES; BLUE DELTA ENERGY, LLC; CARBON SOLUTIONS GROUP; CITIZENS UTILITY BOARD; COALITION FOR COMMUNITY SOLAR ACCESS; ELEVATE ENERGY; ENSYNC, INC.; ENVIRONMENTAL DEFENSE FUND; ENVIRONMENTAL LAW & POLICY CENTER; GRID ALTERNATIVES, INC.; THE ILLINOIS CHAMBER OF COMMERCE; ILLINOIS MUNICIPAL ELECTRIC AGENCY; THE ILLINOIS POWER AGENCY; ILLINOIS SOLAR ENERGY ASSOCIATION; LITTLE VILLAGE ENVIRONMENTAL JUSTICE ORGANIZATION; NATURAL RESOURCES DEFENSE COUNCIL; NORTHSTAR PV LLC, d/b/a Summitt Ridge Energy; AVANGRID RENEWABLES LLC; EDP RENEWABLES NORTH AMERICA LLC; INVENERGY LLC; NEXTERA ENERGY RESOURCES, LLC; ROBERT BOSCH START-UP PLATFORM NORTH AMERICA LLC; SERIES 2, d/b/a Bosch Building Grid Technologies; SOLAR BUSINESS COALITION; SOLAR DEVELOPMENT ASSOCIATES, LLC; SOLAR ENERGY INDUSTRIES ASSOCIATION; COALITION FOR COMMUNITY SOLAR ACCESS; ILLINOIS SOLAR ENERGY ASSOCIATION; THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* LISA MADIGAN, Attorney General; WABASH VALLEY POWER ASSOCIATION, INC.; and WIND ON THE WIRES, Respondents. |
| District & No. | Second District<br>Docket No. 2-18-0504 |
| Filed | May 2, 2019 |

| | |
|---|---|
| Decision Under Review | Petition for review of order of Illinois Commerce Commission, No. 17-0838. |
| Judgment | Affirmed. |
| Counsel on Appeal | Clifford Berlow, of Jenner & Block LLP, of Chicago, and Matthew E. Price, of Jenner & Block LLP, of Washington, D.C., for petitioner. |
| | James E. Weging, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission. |
| | Bradley D. Klein, of Chicago, for respondents Environmental Law & Policy Center *et al.* |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion. Justices Schostok and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Under recently enacted legislation, the Illinois Power Agency (IPA) developed a long-term renewable resources procurement plan (plan) to promote renewable energy, including the implementation of three programs that provide financial support to small renewable energy generation facilities (generation facilities) that might not be economically viable otherwise. Under the plan, the generation facilities memorialize their energy production through renewable energy credits (credits) that the IPA then procures on behalf of three large electric utilities: petitioner, Commonwealth Edison Company (ComEd), Ameren Illinois Company (Ameren), and MidAmerican Energy Company (MidAmerican) (collectively, Electric Utilities). The generation facilities sell credits to the Electric Utilities, which then pass along certain costs to their customers.

¶ 2    Some generation facilities operate in the service areas of (1) electric utilities operated by municipalities, (2) rural electric cooperatives, and (3) the Mount Carmel Public Utility (collectively, Local Utilities), which are not subject to the plan.[1] The plan as approved compels the Electric Utilities to buy credits from generation facilities operating in the service areas of the Local Utilities, but the Local Utilities are statutorily exempt from purchasing credits.

_____

[1] The Mount Carmel Public Utility is a public utility regulated by the Illinois Commerce Commission, but its small customer base exempts it from the plan's credit procurement requirements, and the parties treat Mount Carmel as a municipal utility for purposes of the programs.

¶ 3     On April 3, 2018, the Illinois Commerce Commission (Commission) approved the plan. The Commission concluded that the generation facilities eligible for the programs are statutorily defined to include those within the service areas of the Local Utilities. On appeal, ComEd argues that the legislature intended to exclude the generation facilities operating in the service areas of the Local Utilities from participating in the programs.

¶ 4     We acknowledge that terms like "electric utility" and "utility" are not deployed with precision, rendering the statutory scheme ambiguous. However, deferring to the Commission's expertise, we agree with the Commission's interpretation in favor of the stated legislative intent of promoting the programs. We affirm.

¶ 5                                    I. BACKGROUND
¶ 6                    A. Large Electric Utilities Versus Small Local Utilities
¶ 7     The Electric Utilities provide electric service to retail customers on their low-voltage local distribution networks within their service territories. ComEd has a service territory in the northern part of the state. Ameren has a service territory in the southern part of the state. MidAmerican has a service territory in and around the Quad Cities. The Local Utilities, meanwhile, have service territories akin to islands within the service territories of the Electric Utilities.

¶ 8     On December 7, 2016, the legislature enacted Public Act 99-906, commonly known as the Illinois Future Energy Jobs Act, with provisions to increase the state's commitment to renewable energy. Pub. Act 99-906, § 5 (eff. June 1, 2017). Public Act 99-906 modernized the Illinois renewable portfolio standard, creating new programs to encourage the deployment of solar photovoltaics and other renewable energy technologies throughout the state.

¶ 9     To achieve the broad new goals of the renewable portfolio standard, the legislation directed the IPA to develop plans subject to review and approval by the Commission. 220 ILCS 5/16-111.5(b) (West 2016). Under the plan at issue, the Electric Utilities must purchase a certain number of credits each year. 20 ILCS 3855/1-75(a), (c) (West 2016). The Local Utilities are not part of the plan and have no obligation to purchase credits because the Illinois Power Agency Act and the Public Utilities Act regulate only "public utilities" (20 ILCS 3855/1-75(c)(1)(N) (West 2016); 220 ILCS 5/1-102 (West 2016)), which are expressly defined to exclude entities owned or operated by municipalities or rural electric cooperatives. 220 ILCS 5/3-105(b)(1), (3) (West 2016). In contrast, an "electric utility" is a "public utility" that "has a franchise, license, permit or right to furnish or sell electricity to retail customers within a service area." 220 ILCS 5/16-102 (West 2016); see 20 ILCS 3855/1-10 (West 2016). ComEd, Ameren, and MidAmerican are "electric utilities" under the Illinois Power Agency Act and the Public Utilities Act. A "municipal utility" is defined separately as a "public utility owned and operated by any subdivision or municipal corporation of this State." 20 ILCS 3855/1-10 (West 2016).

¶ 10                              B. Renewable Energy Credits
¶ 11    The credits memorialize the production of renewable energy by the generation facilities, and the IPA specifies the quantity of credits that the Electric Utilities must procure each year. Under the IPA's direction, the Electric Utilities enter into contracts with eligible generation facilities to purchase the credits. The Electric Utilities recover certain expenses associated with

the credits from their retail customers through a rate charge, subject to a statutory cap. 20 ILCS 3855/1-75(c)(1)(B), (c)(1)(E), (c)(6) (West 2016).

¶ 12    The Illinois Power Agency Act requires that 75% of the credits derive from wind and solar resources. 20 ILCS 3855/1-75(c)(1)(C) (West 2016). Many wind and solar projects are large-scale wind farms or solar arrays that interconnect with the interstate high-voltage transmission system. To be eligible for procurement, these large-scale projects must be located in Illinois or in adjacent states, provided that an adjacent state's facility demonstrates that the operation of the facility will help promote this state's interest in the "health, safety, and welfare of its residents." 20 ILCS 3855/1-75(c)(1)(G)(v), (c)(1)(I) (West 2016).

¶ 13    The parties agree that large-scale generation facilities located in the service territories of the Local Utilities are eligible to sell credits to the Electric Utilities. Accordingly, the plan directs the Electric Utilities to procure credits from those large-scale generation facilities, while the Local Utilities have no obligation to do so.

¶ 14                          C. The Programs

¶ 15    To promote the small-scale, community-level generation facilities that interconnect with low-voltage distribution networks, the legislature directed the IPA to set aside a certain number of credits to be purchased by the Electric Utilities through the three specialized programs at issue in this case: the Adjustable Block Program (20 ILCS 3855/1-75(c)(1)(K) (West 2016)), the Community Renewable Generation Program (20 ILCS 3855/1-75(c)(1)(N) (West 2016)), and the Illinois Solar for All Program (20 ILCS 3855/1-56(b) (West 2016)) (collectively, programs). The Electric Utilities must procure a certain portion of their credits through the programs.

¶ 16    As outlined below, the statutes prescribing the programs refer to "electric utilities" and "utility," which ComEd argues exclude small generation facilities that operate in the Local Utilities' service territories.

¶ 17                   1. The Adjustable Block Program

¶ 18    "The credits from solar facilities must be procured using the Adjustable Block Program" from statutorily defined facilities: at least 50% from "distributed renewable energy generation devices" (distributed generation) and at least 25% from "community renewable generation projects" (community generation). 20 ILCS 3855/1-75(c)(1)(K)(i)-(iii) (West 2016). Distributed generation and community generation are defined in part by their interconnection with the distribution system level of (1) an "electric utility," such as ComEd, "as defined in [section 1-10] of the Illinois Power Agency Act"; (2) a "municipal utility as defined in [section 1-10] that owns or operates electric distribution facilities"; or (3) "a rural electric cooperative as defined in section 3-119 of the Public Utilities Act." 20 ILCS 3855/1-10 (West 2016).

¶ 19    The IPA, to ensure balanced market development throughout the state, must design the Adjustable Block Program to ensure that projects are developed "in diverse locations and are not concentrated in a few geographic areas." 20 ILCS 3855/1-75(c)(1)(K) (West 2016). The IPA must design the Adjustable Block Program to "provide a transparent schedule of prices and quantities to enable the photovoltaic market to scale up and for renewable energy credit prices to adjust at a predictable rate over time." 20 ILCS 3855/1-75(c)(1)(K) (West 2016).

¶ 20    The contracts for credits under the Adjustable Block Program must have at least 15-year terms (20 ILCS 3855/1-75(c)(1)(L)(i) (West 2016)), and either 100% or 20% of the credit purchase price, depending on the size of the generation facility, "shall be paid in full by the *contracting utilities* at the time that the facility producing the credits is interconnected at the distribution system level of the *utility* and energized. The *electric utility* shall receive and retire all credits generated by the project for the first 15 years of operation." (Emphases added.) 20 ILCS 3855/1-75(c)(1)(L)(ii), (iii) (West 2016).

¶ 21                        2. The Community Renewable Generation Program

¶ 22    The Community Renewable Generation Program (20 ILCS 3855/1-75(c)(1)(N) (West 2016)) was created for consumers to participate in renewable energy generation and share the benefits regardless of where the system is installed. To accomplish that goal, consumers may "subscribe" to community generation projects. 20 ILCS 3855/1-75(c)(1)(N) (West 2016). For instance, a subscriber may purchase or lease solar panels in an off-site installation and receive a credit on his monthly electric bill for the energy produced by his share of the installation. This way, a consumer without a roof suitable for a solar installation can attain access to solar energy.

¶ 23    A "[s]ubscriber" means "a person who (i) takes delivery service from an *electric utility*, and (ii) has a subscription of no less than 200 watts to a community renewable generation project that is located in the *electric utility's* service area." (Emphases added.) 20 ILCS 3855/1-10 (West 2016).

¶ 24    The program allows subscriptions to be "portable" and "transferable" such that "subscriptions may be retained by the subscriber even if the subscriber relocates or changes its address within the same *utility* service territory," and "a subscriber may assign or sell subscriptions to another person within the same *utility* service territory." (Emphases added.) 20 ILCS 3855/1-75(c)(1)(N) (West 2016).

¶ 25                        3. The Illinois Solar for All Program

¶ 26    The Illinois Solar for All Program extends renewable energy concepts to low-income communities and communities striving for environmental justice. 20 ILCS 3855/1-56(b)(2) (West 2016). The IPA is directed to reallocate funds from the renewable energy resources fund to provide "incentives for low-income distributed generation and community solar projects." 20 ILCS 3855/1-56(b)(2) (West 2016). The plan disburses these funds through four different programs: (1) the low-income distributed generation incentive, (2) the low-income community solar project initiative, (3) incentives for distributed generation serving non-profit and public sector customers, and (4) low-income community solar pilot projects. The legislative objectives "are to bring photovoltaics to low-income communities in this State in a manner that maximizes the development of new photovoltaic generating facilities, to create a long-term, low-income solar marketplace throughout this State, to integrate, through interaction with stakeholders, with existing energy efficiency initiatives, and to minimize administrative costs." 20 ILCS 3855/1-56(b)(2) (West 2016).

¶ 27    Under the Solar for All Program, the credits may be purchased through an upfront payment "once the device is interconnected at the distribution level system of the *utility* and is energized." (Emphasis added.) 20 ILCS 3855/1-56(b)(3) (West 2016). The credits produced by the facility count toward the obligation for "*the electric utility*" with which the project is

interconnected. (Emphasis added.) 20 ILCS 3855/1-56(b)(3) (West 2016).

¶ 28                                    D. The Commission's Order

¶ 29      On December 4, 2017, the IPA filed with the Commission a petition requesting approval of the plan. The administrative law judge granted ComEd and many other entities leave to intervene. The Illinois Attorney General (AG) and the Staff of the Commission (Staff) also participated in the proceeding.

¶ 30      On April 3, 2018, the Commission issued the final order approving the plan. The order walked through each of the contested issues in the docket, explaining the parties' positions and the Commission's analysis and conclusion.

¶ 31      The Commission explained that the renewable portfolio standard does not apply to the Local Utilities and that those entities do not have renewable energy procurement obligations under Illinois law. The Commission found the arrangement consistent with the Public Utilities Act's exclusion of municipally-owned utilities and rural electric cooperatives from the definition of "public utility." 220 ILCS 5/3-105 (West 2016). Thus, the customers of the Local Utilities do not pay to support the programs. Yet, the plan proposed to allow certain generation facilities in the service territories of Local Utilities to participate in the programs.

¶ 32      ComEd's objection was that the Illinois Power Agency Act did not authorize the IPA to require retail customers of the Electric Utilities to subsidize the small generation facilities within the service territories of entities that are not otherwise subject to the renewable portfolio standard and whose customers are not paying for the benefits. The IPA, the AG, and nine other parties—the Environmental Law & Policy Center; the Natural Resources Defense Council; the Citizens Utility Board; the Carbon Solutions Group; the Solar Business Coalition; Solar Development Associates, LLC; Elevate Energy; GRID Alternatives; and the Joint Solar Parties (consisting of the Solar Energy Industries Association, the Coalition for Community Solar Access, and the Illinois Solar Energy Association)—filed briefs in opposition to ComEd's position. Several entities filed objections to the plan on various grounds, but ComEd is the only entity that challenges the narrow ruling at issue in this appeal.

¶ 33      The Commission framed the issue as whether to allow customers and generation facilities located in the Local Utilities' service territories to participate in the programs. The Commission answered that question in the affirmative.

¶ 34      The Commission noted that the plain language of the Illinois Power Agency Act defines "community renewable generation project" and "distributed renewable energy generation device" to expressly include projects "interconnected at the distribution system level of either an electric utility *** , a municipal utility *** , or a rural electric cooperative as defined in Section 3-119 of the Public Utilities Act." 20 ILCS 3855/1-10 (West 2016). Citing the rules of statutory interpretation, the Commission ruled that, when these terms are used within section 1-56(b) in describing the Illinois Solar for All Program and section 1-75(c) in describing the Adjustable Block Program and the Community Renewable Generation Program, the legislature intended that they be used as defined in section 1-10 of the Illinois Power Agency Act.

¶ 35      Therefore, the Commission concluded, a "community renewable generation project" or a "distributed renewable energy generation device" interconnected with a municipal utility or a rural electric cooperative is eligible to participate in the programs.

¶ 36　　Noting that the legislature limited the type of projects that may participate in the Adjustable Block Program to new photovoltaic projects (20 ILCS 3855/1-75(c)(1)(K) (West 2016)), the Commission held that the legislature did not intend to limit what *service territories* could participate, only what *type of projects* could participate in the programs.

¶ 37　　Further, the Commission found an established precedent of participation by generation facilities outside the service territory of the contracting utility in renewable resource procurement programs under Illinois law. The IPA pointed out that Illinois law has never required that generation facilities that produce credits actually be in the utilities' service territories to meet the utilities' compliance obligations under the renewable portfolio standard. Moreover, qualifying facilities in adjacent states are eligible to contribute to renewable portfolio standard compliance by selling credits to contracting utilities in Illinois.

¶ 38　　The Commission determined that the legislature did not intend to incentivize out-of-state renewable development while disqualifying a large portion of Illinois from participating in the programs, especially when the programs ostensibly are designed for "diverse locations and are not concentrated in a few geographic areas." 20 ILCS 3855/1-75(c)(1)(K) (West 2016).

¶ 39　　Given the precedent and clear language, the Commission expressed sympathy for developers of renewable energy projects and Illinois citizens who have invested in new generation facilities outside the investor-owned utility territories expecting incentives from the Future Energy Jobs Act. A sudden reversal of expectations would cause harm that should not be ignored.

¶ 40　　In arguing against this approach, ComEd cited the program provisions that use the terms "utility," "electric utility," and "contracting utility" and argued that the statutes exclude generation facilities located in the Local Utilities' service territories. ComEd pointed out that "electric utility" has a definition distinct from "municipal utility" and that "rural electric cooperative" does not even have "utility" in its name.

¶ 41　　The Commission responded that these instances of defining "utility" do not supplant the more direct and unambiguous definitions found in section 1-10 of the Illinois Power Agency Act, which clearly state that distributed generation or community generation may be interconnected with a municipal utility or rural electric cooperative. The Commission concluded that, had the legislature sought to further narrow those definitions in applying these terms to the Adjustable Block Program and the Illinois Solar for All Program, it could have easily done so through an express statement that such projects are excluded.

¶ 42　　The Commission reconciled the conflicting interpretations by concluding that the legislature simply used the term "electric utility" more "colloquially" in certain parts of the Illinois Power Agency Act and intended to refer to whatever entity serves as the interconnecting utility—even if it is a municipal utility or rural electric cooperative—as the "electric utility," which is how the utility's customer would likely understand it.

¶ 43　　ComEd also alleged practical difficulties potentially resulting from allowing participation in the programs by projects in the Local Utilities' service territories. The Commission expressed sensitivity to operational challenges and sought smooth implementation of the programs, but it found that the plan adequately addresses any operational challenges that ComEd alleged could occur.

¶ 44　　Most notably, the plan's requirements that the Local Utilities adopt net metering policies equivalent to those of the Electric Utilities will ensure that customers of the Local Utilities

receive bill crediting commensurate with state-regulated electric utility customers. The Commission adopted the plan as written to include in the programs the small generation facilities in the service territories of municipal electric utilities and rural electric cooperatives.

¶ 45 ComEd filed a petition for rehearing on May 3, 2018, that the Commission denied in conference on May 17, 2018. ComEd filed a timely notice of appeal to this court within 35 days, on June 19, 2018. See 735 ILCS 5/3-103 (West 2016).

¶ 46                                          II. ANALYSIS

¶ 47 ComEd argues that the legislature did not intend to allow small generation facilities located in the service territories of municipal utilities and rural electric cooperatives to qualify to sell credits under the programs because the municipal utilities and rural electric cooperatives do not contract to obtain any credits under the programs, and their customers are not paying the costs. Instead, ComEd argues, the legislature intended to limit participation in the programs to generation facilities located in the service territories of the Electric Utilities, whose customers are bearing the programs' costs. For the following reasons, we agree with the Commission that generation facilities located in the service territories of municipal utilities and rural electric cooperatives are eligible to participate in the programs.

¶ 48                                   A. Standard of Review

¶ 49 Section 16-111.5(b)(5) of the Public Utilities Act, adopted as part of Public Act 99-906, sets forth various provisions relating to the procurement of long-term renewable resources. 220 ILCS 5/16-111.5(b)(5) (West 2016). Section 16-111.5(b)(5)(ii)(C) sets forth the procedure for the review and approval of long-term renewable procurement plans by the IPA. 220 ILCS 5/16-111.5(b)(5)(ii)(C) (West 2016).

¶ 50 Section 16-111.5(b)(5)(ii)(D) of the Public Utilities Act provides the standard by which the Commission must assess a plan:

> "The Commission shall approve the initial long-term renewable resources procurement plan and any subsequent revisions, including expressly the forecast used in the plan and taking into account that funding will be limited to the amount of revenues actually collected by the utilities, if the Commission determines that the plan will reasonably and prudently accomplish the requirements of Section 1-56 and subsection (c) of Section 1-75 of the Illinois Power Agency Act." 220 ILCS 5/16-111.5(b)(5)(ii)(D) (West 2016).

¶ 51 Review of final decisions of the Commission involves the exercise of special statutory jurisdiction and is constrained by the provisions of the Public Utilities Act. *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29. Section 10-201(d) of the Public Utilities Act provides that "[t]he findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission" and that "rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable." 220 ILCS 5/10-201(d) (West 2016). ComEd, as the entity appealing from the final order, bears the burden of proof upon all issues raised by the appeal. See 220 ILCS 5/10-201(d) (West 2016).

¶ 52 The Public Utilities Act further provides, however, that a "court shall reverse a Commission *** order or decision, in whole or in part, if it finds," *inter alia*, that the "findings

of the Commission are not supported by substantial evidence based on the entire record of evidence" or that the "order or decision is without the jurisdiction of the Commission" or "is in violation of the State or federal constitution or laws." 220 ILCS 5/10-201(e)(iv) (West 2016).

¶ 53   Here, there is no dispute that the IPA and the Commission have jurisdiction over the Electric Utilities but not over the Local Utilities. 220 ILCS 5/3-105 (West 2016) ("public utilities" are not utilities operated by any political subdivision or municipal corporation of this state or electric cooperatives). Therefore, the Local Utilities have no obligation to financially support the generation facilities by purchasing credits under the plan.

¶ 54   ComEd contends that the programs are not open to generation facilities within the service territories of the Local Utilities and, therefore, the Commission's order contradicts the plain language of the statute. ComEd's argument is one of statutory interpretation.

¶ 55   The primary objective in interpreting a statute is to ascertain and give effect to the intent of the legislature. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). The best evidence of the legislature's intent is the language of the statute itself. *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 451-52 (1997). Statutes must not be read in isolation, but as a whole; all relevant parts of the statute must be considered when courts attempt to define the legislative intent underlying the statute. *People v. NL Industries*, 152 Ill. 2d 82, 98 (1992). Moreover, when an act defines its terms, those terms must be construed according to the definitions contained in the act. *Robbins v. Carbondale Police Pension Board*, 177 Ill. 2d 533, 540 (1997).

¶ 56   Courts are not bound by the Commission's rulings on questions of law, which we review *de novo*. *Illinois Landowners Alliance, NFP*, 2017 IL 121302, ¶ 29. However, courts have consistently afforded "substantial weight and deference" to the Commission's interpretation of a statute that it is charged with administering and enforcing. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983); *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009). "A significant reason for this deference is that courts appreciate that agencies can make informed judgments upon the issues, based upon their experience and expertise." *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 153. We agree with the Environmental Law & Policy Center that this case involves precisely the type of complex statute where the Commission and the IPA's collective experience and expertise is valuable. Thus, we afford "substantial weight and deference" to their interpretation of the Illinois Power Agency Act when considering whether ComEd has met its burden of proof.

¶ 57   <center>B. Generation Facility Eligibility</center>

¶ 58   Program eligibility is determined, in part, by the way the generation facility interconnects with the distribution network. The Illinois Power Agency Act makes small-scale generation facilities that are interconnected with the Local Utilities eligible for the programs. The credits from solar facilities must be procured using the Adjustable Block Program from statutorily defined facilities: distributed generation and community generation. 20 ILCS 3855/1-75(c)(1)(K)(i)-(iii) (West 2016). Section 1-10 of the Illinois Power Agency Act defines distributed generation and community generation to include projects interconnected with the distribution system level of an electric utility, a municipal utility, or a rural electric cooperative. 20 ILCS 3855/1-10 (West 2016). We agree with the Commission that, when these terms are used in section 1-56(b) in describing the Illinois Solar for All Program and section

1-75(c) in describing the Adjustable Block Program and the Community Renewable Generation Program, the legislature intended that they be used as defined in section 1-10 of the Illinois Power Agency Act, as distributed generation and community generation are not defined anywhere else. The legislature unambiguously contemplated that generation facilities subject to the plan might be interconnected with the Local Utilities. Therefore, assuming that the other statutory requirements are met, a distributed generation device or community generation project interconnected with a municipal utility or a rural electric cooperative is eligible to participate in the programs.

¶ 59    ComEd responds that, although section 1-10 of the Illinois Power Agency Act defines distributed generation and community generation broadly to permit interconnection with an electric utility, municipal utility, or rural electric cooperative, these definitions (like all of the definitions in section 1-10) are subject to additional qualifications or restrictions that the legislature might apply to them in the context of a given statute.

¶ 60    For example, section 1-10 of the Illinois Power Agency Act defines distributed generation and community generation to include a project or device "powered by wind, solar thermal energy, photovoltaic cells or panels, biodiesel, crops and untreated and unadulterated organic waste biomass, tree waste, and hydropower that does not involve new construction or significant expansion of hydropower dams." 20 ILCS 3855/1-10 (West 2016). Yet, when the legislature created the Adjustable Block Program in section 1-75(c)(1)(K) of the Illinois Power Agency Act, it more narrowly defined these terms by restricting the eligible projects and devices to "new photovoltaic projects." 20 ILCS 3855/1-75(c)(1)(K) (West 2016). As a result, ComEd argues, the definitions in section 1-10 do not apply to the Adjustable Block Program.

¶ 61    ComEd argues that we should look to the Public Utilities Act to discern the scope of the programs prescribed by the Illinois Power Agency Act. The Illinois Power Agency Act (20 ILCS 3855/1-10 (West 2016)) and the Public Utilities Act (220 ILCS 5/16-102 (West 2016)) each define "electric utility" as a type of "public utility." In turn, the Public Utility Act's definition of "public utility" explicitly excludes municipal utilities and rural electric cooperatives. 220 ILCS 5/3-105 (West 2016). ComEd concludes that the legislature expressed its intent to exclude municipal utilities and rural electric cooperatives from the programs by using the terms "electric utility" and "utility" in the statutes that codify the programs.

¶ 62    First, ComEd points out that section 1-75(c)(1)(L) of the Illinois Power Agency Act ties the payment requirement for credits purchased under the Adjustable Block Program to the time that the project is interconnected with the distribution system of the "contracting electric utility." 20 ILCS 3855/1-75(c)(1)(L)(ii)-(iii) (West 2016). Second, payment for credits under the Illinois Solar for All Program corresponds to the time that the device is interconnected with the distribution system level of the "utility" and is energized. 20 ILCS 3855/1-56(b)(3) (West 2016). Third, the Community Renewable Generation Program requires that "subscriber[s]" to community generation "take[ ] delivery service from an electric utility" (20 ILCS 3855/1-10 (West 2016) (defining subscriber)), which as defined in the Illinois Power Agency Act does not include the Local Utilities. Generation facilities interconnected with the systems of the Local Utilities are not interconnected with the Electric Utilities, and the Local Utilities bear no obligation to purchase credits for these systems.

¶ 63    ComEd argues that these interconnection requirements must be given full effect, citing the axiom that qualifying provisions control and supersede more general provisions. See *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002) ("It is also a fundamental rule of

statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or in another act, both relating to the same subject, the specific provision controls and should be applied."). ComEd concludes that a narrower definition of "contracting electric utility," *i.e.*, the Electric Utilities, should control and exclude generation facilities interconnected with the Local Utilities.

¶ 64    Despite its superficial appeal, ComEd's position is essentially that the provisions linking payment for credits to the timing of interconnection are a better indication of legislative intent than the actual definitions of distributed generation and community generation, which mention municipal utilities and rural electric cooperatives by name, in section 1-10 of the Illinois Power Agency Act. In contrast to sections 1-56 and 1-75, which appear to use "electric utility" and "utility" interchangeably, section 1-10's definitions of distributed generation and community generation explicitly cite the statutory definitions of "municipal utility" and "rural electric cooperative," thus avoiding the other sections' textual imprecision. 20 ILCS 3855/1-10 (West 2016). Specifically, distributed generation and community generation can be interconnected with "a municipal utility as defined in [section 1-10 of the Illinois Power Agency Act] that owns or operates electric distribution facilities" or "a rural electric cooperative as defined in [s]ection 3-119 of the Public Utilities Act." 20 ILCS 3855/1-10 (West 2016).

¶ 65    ComEd also raises concerns about whether the Community Renewable Generation Program can ensure that subscribers can take advantage of the new net metering available to community generation projects. The program requires the kinds of net metering, billing, and crediting services required of the Electric Utilities, but the plan acknowledges that the Local Utilities are not regulated by the IPA or the Commission and are free to decline to take these actions. The plan proposes that the approved vendor obtain a certification confirming that the Local Utilities comply with these requirements, but ComEd argues that it is unclear how the IPA or the Commission will ensure that they continue to comply.

¶ 66    Regarding the Illinois Solar for All Program, the plan states that the law is silent on how to allocate credits from generation facilities that service the territories of the Local Utilities, so the plan allocates to a utility's renewable portfolio standard goals only those credits procured through contracts with that utility. As a result, credits procured through contracts with the IPA would not be applied to the utility's renewable portfolio standard goals as the law requires.

¶ 67    ComEd argues that (1) this approach is inconsistent with section 1-56(b)(3), which expressly requires that all credits purchased under the Illinois Solar for All Program—regardless of whether the contract is executed by the utility or the IPA—be applied and counted toward the utilities' obligations under section 1-75(c) (20 ILCS 3855/1-56(b)(3) (West 2016)); (2) the Adjustable Block Program counts all credits from generation facilities in the service territories of the Local Utilities; and (3) neither the Illinois Power Agency Act nor the Public Utilities Act supports using money collected for the achievement of the state's renewable portfolio standard goals to purchase credits that do not contribute to those goals.

¶ 68    ComEd argues that including generation facilities located in the service territories of the Local Utilities would lead to an absurd result: funds collected from customers are spent on credits that never count toward achievement of the renewable portfolio standard goals. See *Du Page County Election Comm'n v. State Board of Elections*, 345 Ill. App. 3d 200, 208 (2003) ("[A] court should avoid statutory interpretations that lead to absurd results.").

¶ 69    Given that the IPA and others argued that projects within the Local Utilities' service territories should be included because they provide benefits throughout the state, ComEd

argues that it is unclear why credits associated with the statewide benefits should go unrecognized toward achievement of the renewable portfolio standard goals.

¶ 70    ComEd accurately points out that "electric utility" has a definition distinct from "municipal utility" and that "rural electric cooperative" does not even have "utility" in its name. We further acknowledge, as did the Commission, that several program provisions use the terms "utility" and "electric utility" in ways that are inconsistent with the definitional provisions of section 1-10 of the Illinois Power Agency Act. However, this ambiguity does not compel reversal of the order approving the plan.

¶ 71    Even when, as here, review is *de novo*, an agency's construction of the law may be afforded substantial weight and deference if the meaning of the terms used in a statute is uncertain because agencies make informed judgments based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387 n.9 (2010). We defer to the Commission as the agency with expertise over the interpretation of the statutes governing the programs. Only ComEd takes a position contrary to the plan.

¶ 72    Thus, we defer to the Commission's interpretation that these instances of the use of "utility" and "electric utility" do not supplant the more direct and unambiguous definitions found in section 1-10 of the Illinois Power Agency Act, which clearly state that distributed generation and community generation may be interconnected with a municipal utility or rural electric cooperative, as those facilities are statutorily defined. If the legislature had intended to further narrow those definitions in applying these terms to the programs, it could have easily done so through an express statement that such projects are excluded from certain geographic areas.

¶ 73    The Commission reconciled the conflicting interpretations by concluding that the legislature simply used "electric utility" and "utility" more "colloquially" in certain parts of the Illinois Power Agency Act, intending to refer to whatever entity serves as the interconnecting utility, including a municipal utility or rural electric cooperative. In fact, ComEd acknowledges that " 'utility' and 'electric utility' are used interchangeably throughout the [Illinois Power Agency] Act," which tends to undermine its assertion that the legislature intended to deploy the terms with precision to define the scope of program eligibility. If the legislature had intended "electric utility" to refer only to ComEd, Ameren, and MidAmerican, it would have used that term throughout the Illinois Power Agency Act and not resorted to "utility" as shorthand. The legislature could have taken a much simpler route to articulate specific geographic restrictions for the programs than by defining terms differently in various statutes. Using cryptic references to "electric utility" and "utility" to place restrictions on the programs would be unnecessarily convoluted.

¶ 74    Moreover, including the projects in the service territories of municipal utilities and rural electric cooperatives is more consistent with the stated legislative intent to operate the programs throughout the state:

"The [IPA] shall design its [plan] to maximize the State's interest in the health, safety, and welfare of its residents, including but not limited to minimizing sulfur dioxide, nitrogen oxide, particulate matter and other pollution that adversely affects public health in this State, increasing fuel and resource diversity in this State, enhancing the reliability and resiliency of the electricity distribution system in this State, meeting goals to limit carbon dioxide emissions under federal or State law, and contributing to a

cleaner and healthier environment for the citizens of this State. *In order to further these legislative purposes, renewable energy credits shall be eligible to be counted toward the renewable energy requirements of this subsection (c) if they are generated from facilities located in this State.* The [IPA] may qualify renewable energy credits from facilities located in states adjacent to Illinois if the generator demonstrates and the [IPA] determines that the operation of such facility or facilities will help promote the State's interest in the health, safety, and welfare of its residents based on the public interest criteria described above. To ensure that the public interest criteria are applied to the procurement and given full effect, the [IPA's] long-term procurement plan shall describe in detail how each public interest factor shall be considered and weighted for facilities located in states adjacent to Illinois." (Emphasis added.) 20 ILCS 3855/1-75(c)(1)(I) (West 2016).

¶ 75 The legislative goal was to create programs that were available to "all citizens of the State," but according to the Environmental Law & Policy Center, the Natural Resources Defense Council, and the Solar Business Coalition, adopting ComEd's statutory interpretation would effectively exclude approximately 570,000 citizen and business customers in areas served by municipal utilities and rural electric cooperatives. ComEd's position would deny access to the economic and environmental benefits of these programs to customers in towns and rural areas across the state.

¶ 76 Furthermore, section 1-75(c)(1)(I) distinguishes between in-state and out-of-state generation facilities, thereby placing geographical restrictions on eligibility for the programs. The legislature thus contemplated geographical restrictions and made them explicit in the statute, avoiding a convoluted interpretation. This refutes the notion that the legislature used the terms "electric utility" and "utility" to express its intent to geographically exclude generation facilities that operate within the service territories of the Local Utilities.

¶ 77 Under these circumstances, we agree with the Commission's determination that the plan will reasonably and prudently fulfill the requirements of section 1-56 and section 1-75(c) of the Illinois Power Agency Act. See 220 ILCS 5/16-111.5(b)(5)(ii)(D) (West 2016).

¶ 78                                   III. CONCLUSION
¶ 79 We hold that the Commission did not err in approving the IPA's plan to allow renewable energy generation facilities located in the service territories of municipal electric utilities and rural electric cooperatives to participate in new renewable energy support programs. Thus, for the reasons stated, the order of the Commission is affirmed.

¶ 80 Affirmed.